550 So.2d 595 (1989)
STATE of Louisiana
v.
Reginald ADAMS.
No. 89-K-0392.
Supreme Court of Louisiana.
October 23, 1989.
*596 William J. Guste, Atty. Gen., Harry F. Connick, Dist. Atty., Sandra Pettle, and Kim Garvey, Asst. Dist. Attys., for applicant.
Craig Colwart, Orleans Indigent Defender Program, for respondent.
MARCUS, Justice.
Reginald Adams, along with John A. Dupart and Anthony V. Calcagno, was indicted by the grand jury for the first degree murder of Cathy Ulfers in violation of La. R.S. 14:30. The district attorney entered a nolle prosequi as to Dupart and Calcagno. After a jury trial, defendant was found guilty as charged.[1] After a sentencing hearing, the jury determined that defendant should be sentenced to life imprisonment without benefit of probation, parole or suspension of sentence. The trial judge sentenced defendant in accordance with the determination of the jury. Defendant appealed to the court of appeal which found that the trial judge erred in allowing Calcagno to testify without first determining his competency and in disallowing his statements made to a third person without determining their reliability. The case was remanded to the trial court to make these determinations.[2] The court of appeal further found that the trial judge erred in allowing the jury to view the transcript and tapes of defendant's confession during its deliberations in violation of La.Code Crim.P. art. 793. For these reasons, the court of appeal reversed and remanded the case for retrial.[3] Upon the state's application, *597 this court granted a writ of certiorari to review the correctness of that decision.[4]
On October 7, 1979, Cathy Ulfers, wife of a New Orleans police officer, died as a result of seven gunshot wounds she received as she was entering her home at 3973 Downman Road. The shots were apparently fired by a burglar with a .32 caliber gun. The house showed signs of burglary, as it was ransacked, police awards were removed from the walls and broken, and a few items were missing, including cash and jewelry. Police investigators did not discover any evidence in the case until September 19-20, 1980, approximately one year after the crime. While Reginald Adams was incarcerated for an unrelated charge, he told inmate representatives that he wanted to talk to officers. After being informed of his constitutional rights and that he was under investigation for the murder of Ulfers, Adams agreed to make two tape-recorded statements in which he confessed to committing the murder. Adams stated that Calcagno offered Dupart and him $5,000 each "to hurt" a "police lady." He also stated that he shot the victim while he and Dupart were burglarizing her residence. On the morning after making the statements, Adams directed the officers to the house where the murder occurred.
The state contends that the court of appeal erred in remanding the case to the trial court for a determination of Calcagno's competency to testify or the reliability of his statements to a third person. It maintains that the trial judge properly excluded Calcagno's statements due to their unreliability after Calcagno had exercised his fifth amendment right not to testify.
During the trial proceedings on August 10, 1983, Calcagno made certain inculpatory statements in the hall outside of the courtroom and indicated that he wished to testify in Adams' trial. Because Calcagno had suffered serious head injuries as a result of four gunshot wounds in 1982, the trial judge ordered a psychiatric evaluation to determine his competency to testify as a witness. Outside of the presence of the jury, the trial judge heard the testimony of Dr. Kenneth A. Ritter and Dr. Aris W. Cox and ordered that a more extensive neuropsychological evaluation be conducted. Dr. F. William Black performed an eight-hour examination and filed an evaluative report into the record. Because each doctor concluded that Calcagno was competent to waive his fifth amendment rights and to testify, the court allowed him to testify. Appearing before the court outside of the presence of the jury, Calcagno was called as a witness and, after being duly sworn, asserted his fifth amendment privilege against self-incrimination.[5] The trial judge refused to allow the testimony of a newspaper reporter who heard Calcagno's statements. Denying defendant's motion for a mistrial, the trial judge ruled that defendant could call Calcagno as a witness.
Hearsay is testimony in court or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein and thus resting for its value upon the credibility of the out-of-court asserter. State v. Martin, 458 So.2d 454 (La.1984). The central concern in the exclusion of hearsay evidence is lack of reliability because the declarant is not present, the statement is not made under oath and it is not subject to cross-examination. C. McCormick, Evidence § 245 (E. Cleary ed. 1984). La.R.S. 15:434 provides: "Hearsay evidence is inadmissible, except as otherwise provided in this Code." This court has recognized that the traditional exceptions to the hearsay rule remain in force despite their exclusion from the Code of Criminal Procedure. State v. Smith, 285 So.2d 240 (La.1973). A declaration against penal interest is a recognized exception to the hearsay rule that is admissible when declarant is unavailable at trial and when there is additional evidence indicating that *598 the declarant's statement is reliable. State v. Rushing, 464 So.2d 268 (La.1985).
In Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the United States Supreme Court has also recognized that a defendant's fundamental constitutional right to present witnesses in his own defense requires the court to allow such hearsay evidence if the surrounding circumstances provide "considerable assurance of [the statements'] reliability." The Court considered evidence of the circumstances surrounding a third party's inculpatory statements. The declarant, Gamble McDonald, confessed to the murder of a police officer "on four separate occasions, once when he gave a sworn statement to Chambers' counsel and three other times prior to that occasion in private conversations with friends." McDonald later recanted those confessions. The trial court excluded the testimony of the three witnesses to whom McDonald had confessed shortly after the crime. Each statement was a confession to the murder and was made "spontaneously to a close acquaintance shortly after the murder had occurred." Each was also corroborated by independent evidence that McDonald owned a .22 caliber revolver, the type of gun used in the murder, was present at the scene of the crime, and was seen with a gun in his hand at the time of the murder. The Court concluded that the hearsay statements "bore persuasive assurances of trustworthiness" and were admissible under the declaration against interest exception.
In the instant case, the trial judge observed Anthony Calcagno and reviewed three separate psychological evaluations of his competence. The evaluations indicated that Calcagno had average intelligence but some cognitive impairment, including a recent memory deficit and impaired abstract reasoning. The doctors concluded that he was competent to waive his constitutional rights and to testify at Adams' trial. Dr. Black was uncertain as to the reliability of any testimony that Calcagno might give. Although the hearing and evaluations concerned the issue of Calcagno's competency to testify, the evidence also provided an indication of the statements' reliability. The trial judge knew the substance of Calcagno's inculpatory statements and the surrounding circumstances. The inculpatory statements were clearly against Calcagno's penal interest, as he confessed to committing the murder. Because Calcagno had asserted his fifth amendment privilege against self-incrimination, he was legally unavailable to testify. The inculpatory statements were made approximately four years after the murder. He also made the statements publicly in the hall outside of the courtroom in which Adams' trial was being conducted. There was no independent corroborating evidence linking Calcagno to the murder. After considering the evidence, the trial judge excluded the statements due to their unreliability. The trial judge was correct in this ruling. The court of appeal erred in holding otherwise.
The state also contends that the court of appeal erred in finding that the jury's review of defendant's taped and transcribed confession during its deliberations violated La.Code Crim.P. art. 793. It argues that defendant waived his objection to the jury's review of the transcript when the parties agreed to allow review of the taped confession. Defendant filed a pre-trial motion to prohibit introduction of the transcript of his taped confession at trial, as the tapes were the best evidence. The trial judge ruled that the transcript would be admissible at trial to assist the jury in following the audiotapes. At trial, the state introduced the tapes and transcript into evidence as separate exhibits without objection. Defendant's later objection to the distribution of the transcript to the jury during its hearing of the tapes was overruled by the trial judge. During the jury's deliberations, defendant moved for a mistrial on the ground that the jury was reviewing both the tapes and the transcript. The state responded: "The state has no position." The trial judge denied defendant's motion for a mistrial.
La.Code Crim.P. art. 793 provides:
A juror must rely upon his memory in reaching a verdict. He shall not be permitted to refer to notes or to have access *599 to any written evidence. Testimony shall not be repeated to the jury. Upon the request of a juror and in the discretion of the court, the jury may take with it or have sent to it any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict.
Because the statute contains prohibitory language, the trial judge has no discretion to make exceptions. "The general reason for the prohibition is a fear that jurors might give undue weight to the limited portion of the verbal testimony thus brought into the room with them." State v. Freetime, 303 So.2d 487, 488 (La.1974), aff'd after remand, 334 So.2d 207 (La. 1976). This court has held that the jury's review of written evidence for its verbal contents in violation of La.Code Crim.P. art. 793 constitutes reversible error. State v. Perkins, 423 So.2d 1103, 1110 (La.1982); Freetime, 303 So.2d at 490. Just as a party may knowingly and voluntarily waive his constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), parties may agree to waive a statutory provision such as La.Code Crim.P. art. 793. Such an agreement must be in clear express language and must be reflected in the record.
In the instant case, defendant contends that the jury reviewed the tapes and transcript of his confession during its deliberations without his knowledge or consent. The state asserts that defendant waived his objection to the jury's review of the transcript when he agreed to allow the jury to hear the tapes. However, the record contains no evidence of such an agreement. When defendant moved for a mistrial on the ground that the jury was viewing the tapes and transcript of his confession, the state failed to respond or to present evidence of the parties' agreement. Accordingly, it was reversible error to permit the jury to view the tapes and transcript of defendant's confession during its deliberations since the record contains no agreement between the parties allowing the jury to do so. The court of appeal correctly reversed defendant's conviction and sentence on this ground.

DECREE
For the reasons assigned, the judgment of the court of appeal is affirmed in part and reversed in part. Defendant's conviction and sentence are reversed, and the case is remanded to the trial court for a new trial.
DENNIS, J., concurs with reasons.
DENNIS, Justice, concurring.
I respectfully concur.
Although the majority may be correct in stating in its footnote two that Article 103 of the Louisiana Code of Evidence is inapplicable to this case, in my opinion it would be incorrect to infer that a defendant did not have the right prior to the adoption of the code to make an offer of proof after the court had sustained an objection to the introduction of his evidence. Prior to the advent of the code, much of our evidence law consisted of jurisprudential rules derived from the common law and treatises on evidence law. According to these sources, it is well settled that when an offer of proof is proper, the trial court must permit it to be made. See McCormick on Evidence, § 51 at 123 (3d Ed.1984); 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 103[03] (1989); Annot., 89 A.L.R.2d 279 (1963); 88 CJS Trial § 73. Of course, the failure to allow a formal proffer may constitute harmless error where the nature of the evidence not admitted is otherwise sufficiently indicated, since the purpose of a proffer is to inform the trial and appellate courts of the nature of that evidence. Id. In this case, the failure to allow a formal proffer may have been harmless because the substance of the evidence was made known to the court by counsel.
Furthermore, because this case has been remanded for a new trial, Article 804(B)(3) of the Evidence Code must be applied in determining whether Calcagno's statement against interest is admissible in the new trial. This article, in pertinent part, provides: "A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless *600 corroborating circumstances clearly indicate the trustworthiness of the statement." Id. Whether a particular statement qualifies as a statement against interest is a matter for the judge to determine under the authority of Article 104(A) of the Evidence Code. Like the other exceptions to the hearsay rule, the statement against interest is subject to the balancing test of Article 403 of the Code. G. Pugh, R. Force, G. Rault, K. Triche, Handbook on Louisiana Evidence Law, Art. 804(B)(3), authors' note (5) at 309 (1989).
On remand, the trial court also should avoid confusing (as this court did in the majority opinion and in State v. Rushing, 464 So.2d 268 (La.1985)) the ordinary trustworthiness standard of Article 804(B)(3) ("corroborating circumstances clearly indicat[ing] trustworthiness") and the especially high trustworthiness level (quadruply corroborated trustworthiness) of the out-of-court statements in Chambers v. Mississippi that helped to convince the Supreme Court that their exclusion violated the Due Process Clause of the Fourteenth Amendment. In Chambers several statements against penal interest had been excluded because Mississippi recognized such an exception to its hearsay rule only for declarations against pecuniary interest. The hearsay statements, however, were critical to the defense and bore substantial assurances of trustworthiness, including that each was made spontaneously to a close acquaintance of the declarant, that each was corroborated by other evidence in the case, that each was in a real sense against the declarant's interest, and that the declarant was present and available for cross-examination by the state. In concluding that the exclusion of this critical evidence, coupled with the state's refusal to permit the defendant to cross-examine the declarant under its voucher rule, denied him due process of law, the Supreme Court remarked that the "persuasive assurances of trustworthiness" of the hearsay statements were "well within the basic rationale of the exception for declarations against interest." In determining whether a statement against penal interest is admissible in Louisiana, however, it is not required that the declaration have such an extremely high degree of reliability or that the other assurances of trustworthiness present in Chambers exist. It is merely necessary that "corroborating circumstances clearly indicate the trustworthiness of the statement." La.Evidence Code Art. 804(B)(3).
NOTES
[1] Defendant filed motions for a post verdict judgment of acquittal and a new trial. The record does not indicate that any action has been taken on these motions by the trial judge. Since we will affirm the reversal of defendant's conviction and sentence and remand the case to the trial court for a new trial, action on these motions is unnecessary.
[2] The court of appeal also found that the trial judge improperly disallowed a proffer of Calcagno's statements to a third person under the new La.Code of Evidence. The Louisiana legislature enacted the Code of Evidence on July 8, 1988. Acts 1988, No. 515. Section 12(3) of the Act provides: "All the provisions of this Act shall become effective on January 1, 1989." Section 12 also provides that the Act applies to cases instituted or trials commenced on or after the Act's effective date. Acts 1988, No. 515, § 12(1) &(2). The Code of Evidence is procedural, not substantive. Procedural rules usually apply retroactively unless the legislature states otherwise. Here, the legislature has clearly stated that the Act applies to cases instituted or trials commenced after January 1, 1989. Defendant was indicted by the grand jury on October 9, 1980, and his trial commenced on August 8, 1983. Hence, the court of appeal erred in applying the new La.Code of Evidence.
[3] 537 So.2d 1262 (La.App. 4th Cir.1989).
[4] 543 So.2d 2 (La.1989).
[5] Contrary to the finding of the court of appeal, it is obvious that the trial judge found Calcagno competent to testify after hearing the testimony of Drs. Ritter and Cox.